**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CATHERINE THAMAN,** | : | |
| **Plaintiff,** | : | **Case No. 2:03-cv-210** |
| **v.** | : | **Judge Holschuh** |
| **OHIOHEALTH CORPORATION,** | : | **Magistrate Judge Kemp** |
| **Defendant.** | : | |
| | : | |

**<u>Memorandum and Order</u>**

Plaintiff, Catherine Thaman, brings this action pursuant to Title VII of the Civil Rights Act of 1964, alleging that Defendant created a hostile work environment in which she experienced sexual harassment and alleging that Defendant retaliated against her by terminating her employment. Plaintiff also asserts supplemental state law claims pursuant to Ohio Revised Code § 4112.02, alleging that Defendant created a hostile work environment in which she experienced sexual harassment and alleging that Defendant intentionally inflicted emotional distress upon her. Additionally, Plaintiff alleges violations of Ohio's public policy based on Title VII and Ohio Revised Code § 4112.02.[1] This matter is before the Court on Defendant's motion for summary judgment. (Doc. # 14).

---

[1]Plaintiff agreed to dismiss a claim of violation of Ohio public policy with regard to her consultation of legal counsel. (<u>See Stipulation of Dismissal Public Policy-Consult Legal Counsel</u>, Doc. # 27).

## I. Background

On September 12, 1999, Plaintiff was hired by Defendant to work as an administrative

assistant in the Facilities Engineering Department at Riverside United Methodist Hospital.

(Amended Complaint at ¶ 5).  Patrick Siconolfi, Director of the Facilities Engineering

Department, was Plaintiff's direct supervisor.  (Deposition of Catherine Thaman at pp. 22-23;

Deposition of Patrick Siconolfi at p. 22).  During orientation, Plaintiff signed a document

acknowledging the receipt of the OhioHealth Employment Handbook, which included

Defendant's policy on sexual harassment in the workplace.  (Thaman Dep. at pp. 201-03).

Defendant's sexual harassment policy provides in relevant part:

> OhioHealth recognizes that harassment of any kind directed at an
> employee, including harassment of a sexual nature, is improper and
> will not be tolerated ...
>
> Our policy does not prohibit you from engaging in normal social
> relationships with your co-workers.  Our policy does prohibit you,
> however, from making unwelcome advances or requests for favors,
> both verbal or physical, of a sexual nature...  Lastly, such conduct is
> prohibited if it interferes with the staff member's work performance
> or creates an intimidating, hostile, or offensive working environment.
>
> Any occurrence that you believe is contrary to this policy should be
> reported immediately to your supervisor and/or the Human Resources
> department to assure that appropriate actions are taken....

(Thaman Dep. Exhibit 21).   Plaintiff admits that she read the Employee Handbook and knew

of the sexual harassment policy.  (Thaman Dep. at p. 202).

Plaintiff alleges that shortly after she began working for Defendant, Siconolfi warned

her that she might have "problems with three or four guys in the department." (Id. at p. 24).

Plaintiff contends that Siconolfi also told her to let him know if anything did happen so that he

could "deal with the situation harshly." (Id.).  Siconolfi, however, denies making these

statements.  (Siconolfi Dep. at pp. 77-78).

Plaintiff alleges that, within the first two weeks of work, she began to experience sexual harassment that continued throughout her employment.  (Thaman Dep. at p. 25; Am. Compl. at ¶ 6).  Plaintiff alleges that she experienced "unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature."  (Am. Compl. at ¶ 6).  Plaintiff contends that, over the course of her employment, she made numerous complaint to Siconolfi regarding her allegations of sexual harassment.  Siconolfi admits to receiving, and specifically dealing with, four complaints made by Plaintiff.  (Siconolfi Dep. at pp. 26-36, 42-44).  Siconolfi, however, denies knowledge of any other complaints of sexual harassment made by Plaintiff.

### A.  Complaints Siconolfi Admits Receiving

Plaintiff explains that the first incident of sexual harassment occurred when a co-worker approached her and commented that "I'd give anything if I knew you better right now."  (Thaman Dep. at p. 25).  Plaintiff responded that she did not appreciate the comment and asked the co-worker to stay away from her.  (Id.).  Plaintiff alleges that the co-worker then poked her in the waist and followed her into her office.  (Id.).  Plaintiff reported this incident to the co-worker's supervisor who advised Plaintiff to report the incident as a diversity issue to a diversity liaison.[2]  (Id. at p. 26).

Plaintiff also informed Siconolfi, who reassured her that the situation would be dealt with.  (Id.; Siconolfi Dep. at pp. 32-35).  Siconolfi contends that he discussed the situation with Plaintiff's co-worker.  (Siconolfi Dep. at pp. 32-35).  Plaintiff admits that the co-worker

---

[2]Siconolfi explained that a diversity liaison is an employee that has received training to deal with "diversity" issues within the department.  (Siconolfi Dep. at p. 37).  Diversity issues include, *inter alia*, allegations of sexual harassment.  (Id. at p. 38).

3

apologized and that she did not encounter any problems with that co-worker thereafter. (Thaman Dep. at p. 29).

Plaintiff also claims that her co-workers would make lewd and inappropriate faces and gestures to her through a window in her office. (Thaman Dep. at pp. 67-69). Siconolfi contends that he dealt with the situation by discussing the matter with the co-workers' supervisor and by instructing Plaintiff to keep her office blinds closed. (Siconolfi Dep. at pp. 93-94).

Another incident arose when a co-worker, considered by Plaintiff to be a friend, was conversing with the Plaintiff about the Plaintiff's loss of weight. During the course of the conversation, the co-worker asked Plaintiff the size of her breasts and whether they were real. (Thaman Dep. at p. 77). Plaintiff, feeling uncomfortable, asked Siconolfi for his assistance. (Id.; Siconolfi Dep. at pp. 29, 43-44, 98-100). However, Plaintiff specifically requested that Siconolfi not mention the comment to the co-worker because Plaintiff did not want to make a complaint and wanted to deal with the situation on her own. (Thaman Dep. at p. 77). Against Plaintiff's wishes, Siconolfi confronted the co-worker; the co-worker was also reprimanded by his own supervisor. (Id.).

Plaintiff alleges that this incident ultimately led to further harassment which manifested itself in the form of co-workers taking bets on Plaintiff's bra size. (Thaman Dep. at pp. 48-49). Plaintiff, upset by the continuous hectoring, informed Siconolfi about the incident and he allowed her to stay in his office until she calmed down. (Id. at pp. 49-50). Siconolfi later instructed Plaintiff to speak with a diversity liaison about the situation. (Id.). After the diversity liaison spoke with the co-worker who had initiated and promoted the bets, the co-

4

worker made a barren attempt, according to Plaintiff, to apologize: "I didn't mean to hurt your feelings and, plus, I don't think your breasts are really that big."  (Id. at p. 50).  Plaintiff refused to accept the apology and informed Siconolfi.  (Id. at p. 51).   Siconolfi admits to referring Plaintiff to the diversity liaison in order to resolve the problem, but he cannot recall Plaintiff informing him of the allegedly deficient apology.  (Siconolfi Dep. at pp. 86-87).

**B. Complaints Siconolfi Denies Receiving**

Plaintiff claims to have experienced many other uncomfortable, sexually harassing situations while working for Defendant.  As was discussed *supra*, Plaintiff admits that her first complaint regarding sexual harassment was resolved.  However, Plaintiff alleges that the particular co-worker's supervisor, along with the diversity liaison, improperly notified other employees of the incident.  Plaintiff alleges that other co-workers thereafter harassed her about the incident for several weeks, were rude to her when she called them about a job, and refused to return her pages.  (Thaman Dep. at pp. 29-32).  Plaintiff contends that she complained about this treatment to Siconolfi who allegedly told her to "just to give it some time."  (Id. at p. 32).

Plaintiff also claims that the diversity liaison had once pinned her against a wall, leaned in to her, and whispered "[d]o you consider this a diversity issue."  (Thaman Dep. at p. 45).  Again, Plaintiff alleges that Siconolfi told her that he would deal with the situation, but, to Plaintiff's knowledge, nothing was ever done.  (Id. at 46).  Siconolfi denies having knowledge of this particular statement and behavior, but he does admit to knowing that there was an incident between Plaintiff and the diversity liaison.  (Siconolfi Dep. at pp. 84-85).

Plaintiff claims that she was asked constantly whether she wore underwear, whether she had an attractive sister or daughter, and why she did not dress in a more revealing manner.

5

(Thaman Dep. at pp. 78-80).  Plaintiff alleges that Siconolfi appeared amused when she apprised him of the comments made about her bra and panties and responded with "boys will be boys."  (Id. at p. 43).

Plaintiff also claims that a co-worker rubbed her back fairly often, despite her efforts to make him stop.  (Thaman Dep. at pp. 33-35).  Plaintiff alleges that she informed both Siconolfi and the co-worker's supervisor, as well as another supervisor that she trusted, but that the situation continued because, as Plaintiff alleges, nothing was done to correct the situation.  (Id. at pp. 34-36).  Siconolfi denies being informed of this.  (Siconolfi Dep. at p. 81).

Plaintiff also asserts that co-workers made multiple inappropriate comments to her including: that she had nice legs and that the co-worker would love to climb them; "[y]ou could chain me up and strip me down and I would be your love slave"; "I would do just about anything to see you naked"; "I would love it if you would tie me up and beat me with a whip"; "I love coming in the office just to smell you";"my, don't we look perky today [a]nd...I'm not talking about your smile"; and that Plaintiff wanted a co-worker's "winky."  (Thaman Dep. at pp. 71-75; Thaman Dep. Exhibit 2).

Plaintiff claims that even Siconolfi made an inappropriate comment at an office lunch when he was asked why he had hired Plaintiff.  Mr. Siconolfi allegedly responded that he had hired Plaintiff because of "[her] personality and [her] big, umm, nails," all while looking at the Plaintiff's breasts.  (Thaman Dep. at pp. 37-38).  However, Siconolfi does not recall making this comment.  (Siconolfi Dep. at pp. 81-82).

In March, 2001, Siconolfi assured Plaintiff that, when she returned to her job from a scheduled medical leave, things would be much better.  (Thaman Dep. at pp. 51-53).   However,

when Plaintiff eventually returned to work, she alleges that the situation had not gotten any

better and, if anything, had intensified.  (Id. at p. 51).  Plaintiff contends that word of the bra

incident had circulated amongst her co-workers, and workers refused to accept work and phone

calls from the Plaintiff.  (Id. at pp. 51, 54).  Siconolfi denies telling Plaintiff that things would

be better when she returned, and he denies receiving any complaint from Plaintiff that she was

continually sexually harassed once she returned from her medical leave.  (Siconolfi Dep. at p.

88).  This prompted Plaintiff to contact Human Resources for the first time in April, 2001, to

make a formal complaint about the harassment that had been going on for nearly a year and a

half.  (Thaman Dep. at pp. 52, 57).

### C.  Plaintiff's Complaint to Human Resources

On April 19, 2001, Plaintiff met with Bonita Williamson, an Employee Relations

Manger in the Human Resources Department at Riverside.  (Deposition of Bonita Williamson

at pp. 9, 13; Thaman Dep. at pp. 57, 81).  Plaintiff gave Williamson a partial list of incidents

that Plaintiff alleged to be sexual harassment.  (Thaman Dep. at pp. 66-77; Thaman Dep.

Exhibit. 2; Williamson Dep. at p. 14).  Plaintiff concedes that Williamson was very sympathetic

and comforting during the meeting.  (Thaman Dep. at p. 63).   Williamson noted Plaintiff's

allegations and instructed Plaintiff to go home; Williamson indicated that she would contact

Plaintiff the next business day to inform her as to how to proceed.  (Williamson Dep. at p. 15).

After the initial meeting, Williamson spoke with her boss, Don Boswell, Vice President

of Human Resources, and Siconolfi's boss, Ed Cotter, Senior Operating Officer, about the

situation and the need for an investigation.  (Id. at pp. 16-18).  Williamson also suggested that

Plaintiff be placed on paid administrative leave during the investigation.  (Id.).

Williamson then contacted Plaintiff and told her that an investigation would be conducted and that Plaintiff had been approved for administrative leave.  (Id. at pp. 16-17). According to Plaintiff, Williamson informed her that she was approved for temporary leave, (Thaman Dep. at p. 82), and about a week later, Jim Schmidt, an employee in the Human Resources Department who was also working with Williamson on the investigation, called Plaintiff to inform her that permanent administrative leave had been approved.  (Id.).  Plaintiff was informed that she would be placed on permanent administrative leave until she found another job within the company or until the expiration of a ninety (90) day period.  (Id.). Plaintiff found this situation agreeable.  (Id.; Williamson Dep. at p. 16).

Problems soon arose when Plaintiff did not receive her paycheck.  After calling the Payroll Department, Plaintiff discovered that her time had been deleted from the payroll system.  (Thaman Dep. at p. 88).  Plaintiff then contacted Williamson to complain, to remind Williamson that Plaintiff thought this might happen, and to allege that this was retaliation against her.  (Id.).  Plaintiff alleges that Williamson indicated that she agreed with Plaintiff and that she would "deal with it."  (Id.).  Plaintiff concedes that the problem was resolved.  (Id.).

Williamson also informed Plaintiff that, during her period of administrative leave, Jamie Bihl, a Human Resources representative, would be sending Plaintiff job postings from within the company.  (Id. at p. 84).  Plaintiff admits that she received job postings but claims that she did not apply for any of the posted positions because they were below her "hiring rate." (Id.).  Plaintiff contends that she did inquire with Bihl about one position, an executive assistant position in Human Resources, but was told that it was no longer available.  (Id.).

In the meantime, Williamson organized and implemented, with the help of Schmidt, an

8

investigation into Plaintiff's allegations of sexual harassment.[3]  (Williamson Dep. at pp. 19-21).  Williamson and Schmidt interviewed the persons identified by Plaintiff as alleged harassers.  (Williamson Dep. at pp. 21,26).  These witnesses recounted incidents where Plaintiff's behavior was inappropriate and where Plaintiff willingly participated with the men in the office banter.  (Exhibits E, F, attached to Defendant's Motion for Summary Judgment; Siconolfi Dep. at 61-64, 97-98).  In fact, several witnesses claimed that Plaintiff had initiated most of the situations of which she complained.  (Id.).

Due to the lack of consistency between Plaintiff's version of the facts and the witnesses' accounts of the situation, Williamson and Schmidt developed follow-up questions for Plaintiff to answer.  (Williamson Dep. at 53-55; Exhibit G, attached to Defendant's Motion for Summary Judgment).  On May 18, 2001, Williamson and Schmidt administered the follow-up questions and informed Plaintiff of the results and findings of their investigation.  (Thaman Dep. at pp. 91-92; Williamson Dep. at 56; Exhibit H, attached to Defendant's Motion for Summary Judgment).

As a result of the investigation, Williamson concluded that inappropriate behavior had occurred, but that all parties involved, including Plaintiff, had participated in it.  (Williamson Dep. at p. 64).  Williamson informed Plaintiff that sexual harassment and hostile work environment training would be recommended for employees in the Facilities Engineering Department.  (Thaman Dep. at p. 107).  Sexual harassment training was in fact given to employees in November 2001.  (Williamson Dep. at pp 67-69).

---

[3]Williamson also indicated that Carolyn Waring assisted in the investigation. (Williamson Dep. at p. 21-22).

After concluding the investigation, Plaintiff was given an additional ninety (90) day period of paid administrative leave in order to find employment within the company. (Williamson Dep. at pp.74-75, 77-79).  Additionally, Williamson told Plaintiff that, if she wanted to go back to her prior position, it was available.[4]  (Thaman Dep. at p. 112; see also, Affidavit of Bonita Williamson, at ¶5, attached as Exhibit F to Defendant's Motion for Summary Judgment).  However, Plaintiff made it clear that she did not want to return to her prior position.  (Id.).

During Plaintiff's additional ninety days of paid administrative leave, Defendant sent Plaintiff weekly job postings to assist her in locating another position.  (Thaman Dep. at pp. 112-14; Thaman Dep. Exhibit 7).  The job postings sent to Plaintiff included all OhioHealth locations, (Williamson Dep. at pp. 97-98), and Plaintiff testified that there were several jobs at or above her prior level of employment.  (Thaman Dep. at pp. 136-37).  Additionally, Plaintiff testified that Schmidt was very cooperative in providing details regarding the various job postings.  (Id. at p. 116).

Plaintiff concedes that she did not submit any transfer requests to Schmidt as instructed. (Id. at p. 115; see also Williamson Dep. at p. 94).  However, Plaintiff apparently did discuss an employee relations position at Riverside with Williamson.  (Thaman Dep. at p. 89).  Plaintiff, however, alleges that Williamson and Schmidt strongly discouraged her from applying to any positions at Riverside.  (Id. at pp. 89-90, 96).  Plaintiff also interviewed for a position at Doctor's Hospital.  (Id. at pp. 93-94; Am. Compl. at ¶ 14).  However, Plaintiff speculates that

---

[4] Further, Williamson instructed Siconolfi to hold Plaintiff's position open for her until the expiration of the ninety (90) day period.  (Williamson Aff., at ¶ 6).

she was not hired because, when asked, she told the interviewer that she had left Riverside due to sexual harassment.  (Thaman Dep. at pp. 93-94).

On August 10, 2001, Williamson met with Plaintiff to discuss the status of Plaintiff's job search.  (Id. at pp. 119-20; Exhibit L, attached to Defendant's Motion for Summary Judgment).  Plaintiff expressed concern about losing her job because she had not yet found a new position.  (Thaman Dep. at p. 119-20).  Williamson allegedly told Plaintiff that she would not lose her job, but that Williamson would have to contact the Legal Department regarding the situation.  (Id.; Williamson Dep. at p. 88).  Although Williamson contacted the Legal Department within the week before Plaintiff's ninety day period of paid administrative leave expired, the ultimate decision to extend Plaintiff's administrative leave rested with Cotter.  (Williamson Dep. at pp. 88-89).  Williamson recommended extending Plaintiff's administrative leave for thirty (30) additional days, but Cotter did not allow the extension.  (Id. at pp. 91-92).

On August 28, 2001, Plaintiff received a letter from Williamson informing her that her employment had been terminated.  (Thaman Dep. at p. 125; Thaman Dep. Exhibit 10).  The letter also stated that Plaintiff was eligible for re-hire and that Plaintiff should continue to look for jobs with OhioHealth.  (Thaman Dep. Exhibit 10).  Plaintiff alleges that she did in fact submit resumes to OhioHealth through its website after her termination, but did not receive a response from Defendant.  (Thaman Dep. at pp. 126-27).

11

## II. Discussion

### A. Standard

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of

showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving

13

party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her

pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial. If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position

is insufficient; there must be evidence on which the jury could reasonably find for the opposing

party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative

evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court

may, however, enter summary judgment if it concludes that a fair-minded jury could not return

a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S.

at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**B. Application**

**1. Hostile Work Environment**

Plaintiff has asserted claims of sexual harassment under Title VII of the Civil Rights

Act of 1964 as well as Ohio Revised Code § 4112.02. The Ohio Supreme Court has recognized

that the federal evidentiary standards and the analysis used for alleged violations of Title VII

also apply to alleged violations of Ohio Revised Code Chapter 4112. Little Forest Med. Ctr. of

Akron v. Ohio Civil Rights Comm'n, 61 Ohio St.3d 607, 609 (1991). See also Fenton v.

14

HiSan, Inc. 174 F.3d 827, 829 (6th Cir. 1999)(citation omitted).  Therefore, this Court will

analyze Plaintiff's Title VII hostile work environment claim together with her sexual

harassment claim asserted under Ohio Revised Code § 4112.02.

Title VII prohibits an employer from discriminating "against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The

Supreme Court has recognized that sexual harassment is a form of sexual discrimination and

that a plaintiff may establish a violation of Title VII by proving that the sexual discrimination

created a hostile or abusive work environment.  Meritor Savings Bank v. Vinson, 477 U.S. 57,

66 (1986).

Plaintiff has asserted a claim of hostile work environment sexual harassment in this

case.  In order to establish a *prima facie* case of hostile work environment sexual harassment,

Plaintiff must show that:

> (1) she is a member of a protected class,

> (2) she was subjected to unwelcome sexual harassment,

> (3) the harassment was based on her sex,

> (4) the harassment unreasonably interfered with her work
> performance and created a hostile or offensive work environment
> that was severe and pervasive, and

> (5) the employer is vicariously liable.

See Clark v. United Parcel Service, Inc., 400 F.3d 341, 347-48 (6th Cir. 2005) (citations

omitted); Fenton, 174 F.3d at 829-30.  For the purpose of its motion for summary judgment,

Defendant does not dispute the existence of the first four elements of Plaintiff's *prima facie*

15

case. Defendant, however, argues that Plaintiff has failed to establish the fifth element, *i.e.,* that Defendant is vicariously liable for the alleged sexual harassment. Defendant therefore argues that it is entitled to a dismissal of Plaintiff's Title VII claim and her sexual harassment claim based on Ohio Revised Code § 4112.

In determining whether an employer is vicariously liable, the Sixth Circuit has recognized that slightly different standards apply depending on whether the alleged harasser is a co-worker or a supervisor. Clark, 400 F.3d at 348. If the alleged harasser is a co-worker, "[a]n employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Clark, 400 F.3d at 348 (quoting Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999)). See also Fenton, 174 F.3d at 830. If the alleged harasser is a supervisor, and the harassment resulted in a "negative tangible employment action," the employer is vicariously liable.[5] Clark, 400 F.3d at 348.

It appears that Plaintiff has asserted both types of hostile work environment claim in this case: supervisor harassment and co-worker harassment. For instance, in addition to allegations that her co-workers sexually harassed her, Plaintiff also alleges that her supervisor, Siconolfi, made inappropriate comments. Defendant, however, has not moved for summary judgment with respect to Plaintiff's claims of supervisor harassment.

Instead, Defendant has focused exclusively on Plaintiff's claims of co-worker sexual

---

[5]If, however, the alleged harasser is a supervisor and there has been no "negative tangible employment action," then the employer may avail itself of an affirmative defense by showing that (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Clark, 400 F.3d at 348 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998)).

harassment.  As noted *supra*, in order to find Defendant liable for Plaintiff's allegations of co-worker sexual harassment, this Court must determine whether Defendant "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  Clark, 400 F.3d at 348.

With respect to notice, the Sixth Circuit has recognized that an employer may have knowledge of sexual harassment through its agents or supervisory employees.  Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994) (quoting 29 C.F.R. § 1604.11(d)) ("an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").  See also Bremiller v. Cleveland Psychiatric Institute, 195 F.R.D. 1, 29 (N.D. Ohio 2000).

With respect to an employer's response to allegations of sexual harassment, the employer will only be held liable "if [its] remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination."  McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005) (quoting Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 873 (6th Cir. 1997), cert. denied, 522 U.S. 1110 (1998) ).  "The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment."  Id.

### a.  Complaints Siconolfi Admits Receiving

There are several complaints of co-worker sexual harassment made by Plaintiff that her supervisor, Siconolfi, admits receiving.  (Siconolfi Dep. at pp. 26-30, 32-35, 42-44).  As was discussed *supra*, Siconolfi admits that Plaintiff contacted him regarding: (1) a co-worker who

commented "I'd give anything if I knew you better right now," poked Plaintiff in the waist and followed her into her office, (Thaman Dep. at p. 25), (2) co-workers making lewd and inappropriate faces and gestures to her through a window in her office, (Thaman Dep. at pp. 67-69), (3) a co-worker who asked Plaintiff the size of her breasts and whether they were real (Thaman Dep. at p.77), and (4) co-workers taking bets on Plaintiff's bra size, (Thaman Dep. at pp. 48-49).  Defendant does not contend that it lacked notice of these allegations of sexual harassment.  Instead, Defendant argues that, with respect to these complaints, Siconolfi took prompt and appropriate corrective action.

Plaintiff does not dispute that prompt action was taken by Siconolfi with respect to the complaints he admits receiving.  In fact, the record confirms that Siconolfi responded to these complaints promptly.  (Siconolfi Dep. at pp. 26-30, 32-36, 43-44, 93-94, 98-100).  However, Plaintiff does argue that, with respect to these complaints, Siconolfi failed to take appropriate corrective action.

A response is generally adequate if it is reasonably calculated to end the harassment. Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999).  The effectiveness of a response "is measured not by the extent to which the employer disciplines or punishes the alleged harasser, but rather if the steps taken by the defendant halt the harassment."  See Stacy v. Shoney's Inc., 955 F. Supp. 751, 756 (E.D. Ky. 1997), aff'd, 142 F.3d 436 (6th Cir. 1998).

With respect to the four complaints that Siconolfi admits to receiving, it appears that Siconolfi's responses were aimed at preventing any future harassment.  (Siconolfi Dep. at pp. 26-30, 32-36, 43-44, 93-94, 98-100).  For example, Siconolfi told one of Plaintiff's co-workers to stay out of her office, (Id. at pp.  41-42), Siconolfi told Plaintiff to keep her blinds closed so

18

she could not observe any inappropriate gestures through her window, (Id. at p. 94), and Siconolfi even reprimanded one of Plaintiff's co-workers. (Id. at p. 43-44; Thaman Dep. at p. 77).

Moreover, it does not appear from the record that Plaintiff encountered further harassment from the co-workers that were confronted by Siconolfi. (Thaman Dep. at pp. 29, 50, 68, 76-77). This Court concludes that, with respect to these claims, there is no genuine issue of material fact; Plaintiff's evidence is insufficient to create a jury issue with respect to these claims and Defendant is entitled to summary judgment on these particular claims of the Plaintiff.

### b.  Complaints Siconolfi Denies Receiving

Plaintiff alleges numerous other incidents of co-worker sexual harassment. There is no dispute that Defendant had knowledge of Plaintiff's allegations. Plaintiff notified the Human Resources Department on April 19, 2001 regarding her complaints of sexual harassment. (Williamson Dep. at pp. 9, 13; Thaman Dep. at pp. 57, 81).

This Court also concludes that Defendant's response, through the Human Resources Department, was both prompt and appropriate to remedy the allegations of sexual harassment. After Plaintiff made her complaints to the Human Resources Department, she was allowed to leave work immediately and was placed on paid administrative leave. (Williamson Dep. at pp. 15-18; Thaman Dep. at pp. 66-67, 82). Thereafter, Williamson and Schmidt began investigating Plaintiff's complaints.

As a result of the investigation, Williamson concluded that inappropriate behavior had occurred, but that all parties involved, including Plaintiff, had participated in it. (Williamson

Dep. at p. 64).  In an attempt to prevent future incidents of sexual harassment, sexual harassment and hostile work environment training was recommended for employees in the Facilities Engineering Department.  (Thaman Dep. at p. 107, 112-14; Williamson Dep. at pp 67-69, 74-75, 77-79).  This Court concludes that the Human Resources Department's response to Plaintiff's complaints was reasonably calculated to end the alleged harassment.  See McCombs, 395 F.3d at 353; Jackson, 191 F.3d at 663.

However, Plaintiff contends that, prior to reporting the allegations of sexual harassment to the Human Resources Department, she informed Siconolfi.  Siconolfi denies having knowledge of these complaints.  (Siconolfi Dep. at pp. 84-87).  This issue presents a question of material fact.  As was discussed *supra*, notice to a supervisory employee can be imputed to the employer.  Pierce, 40 F.3d at 804.  Thus, if Siconolfi did in fact have knowledge of Plaintiff's other complaints of sexual harassment, then it may be that the response by the Human Resources Department was neither prompt nor reasonable.

Defendant, however, argues that, even if Plaintiff did inform Siconolfi of the other allegations of co-worker sexual harassment, it cannot constitute notice to Defendant because Plaintiff has alleged that Siconolfi also participated in the harassment.  In support, Defendant cites Oman v. Advance Auto Parts, Inc., Case No. 3:02CV7581, 2003 WL 22722952 (N.D. Ohio October 28, 2003).  Oman, however, dealt with claims of harassment by supervisory employees.  Applying the affirmative defense established by the Supreme Court in Faragher,[6]

---

[6]As was noted *supra*, if the alleged harasser is a supervisor and the employer has not taken a negative tangible employment action, the employer can avoid liability by showing that: (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm

the court in <u>Oman</u> held that, by only reporting harassment to one of the harassing supervisors, the plaintiff had unreasonably failed to take advantage of other preventive or corrective opportunities offered by the defendant, *i.e.,* complaining to the next higher management level, calling the Human Resources Department, or calling the Risk Management Department. <u>Oman</u>, 2003 WL 22722952, *2. Thus, <u>Oman</u> is distinguishable from the claims of co-worker sexual harassment asserted by Plaintiff in this case. Furthermore, in this Court's view, *infra*, the Defendant's written policy requiring employees to report sexual harassment to the employee's supervisor has the effect of designating the supervisor as an implementor of its policy, and a complaining employee is not required to go farther up the corporate hierarchy to put the employer on notice of the harassment complaints.

Moreover, while at least one court has recognized that it would be unreasonable to expect an allegedly harassing supervisor to transmit complaints to management about *himself*, <u>see Parkins v. Civil Constructors of Ill.</u>, 163 F.3d 1027, 1037 (7th Cir. 1998), the claims at issue in Defendant's motion for summary judgment are claims of *co-worker* harassment. Defendant's employee handbook requires employees to report allegations of sexual harassment "to your supervisor and/or the Human Resources department to assure that appropriate actions are taken...." (<u>Thaman Dep.</u> Exhibit 21). Thus, Plaintiff acted in accordance with Defendant's sexual harassment policy by reporting the co-worker harassment to her supervisor, Siconolfi, and Plaintiff was therefore entitled to rely on Siconolfi to take appropriate action. <u>See Munroe v. Compaq Computer Corp.</u>, 229 F. Supp.2d 52, 64-65 (D. N.H. 2002); <u>Carter v. America Online, Inc.</u>, 208 F. Supp.2d 1271, 1276-77 (M.D. Fla. 2001) (citing <u>Breda v. Wolf Camera &</u>

---

otherwise." <u>Faragher</u>, 524 U.S. 775, 807-08 (1998)).

Video, 222 F.3d 886, 890 (11th Cir. 2000)).  See also Moore v. KUKA Welding Systems & Robot Corp., 171 F.3d 1073, 1079 (6th Cir. 1999) (concluding that even though supervisor observed and, in some instances contributed to offensive conduct, employer nevertheless was on notice of the conduct).

This Court concludes that any notice received by Siconolfi regarding co-worker harassment constituted notice to Defendant.  See Pierce, 40 F.3d at 804.   An issue of fact, however, remains with respect to whether Siconolfi actually received certain complaints of co-worker sexual harassment.  Therefore, Defendant's motion for summary judgment must be denied in this regard.

### 2.  Retaliation

Plaintiff also claims that Defendant retaliated against her for complaining about the alleged sexual harassment, in violation of 42 U.S.C. § 2000e-3(a), by removing her from her position, not offering her comparable work, and eventually terminating her employment.  (Am. Compl. at ¶¶ 27-29).  Section 2000e-3(a) provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

In order to establish a *prima facie* case of retaliation, Plaintiff must show:

(1) she engaged in activity protected by Title VII;

(2) this exercise of protected rights was know to defendant;

(3) defendant thereafter took adverse employment action against

22

plaintiff, or the plaintiff was subjected to severe or pervasive
retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity
and the adverse employment action or retaliation.

Morris v. Oldham Cty. Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).  If Plaintiff establishes a

*prima facie* case, the burden of production shifts to Defendant to "articulate some legitimate,

nondiscriminatory reason" for its actions.  Morris, 201 F.3d at 792-93 (quoting McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  If Defendant produces such evidence, then

Plaintiff, who bears the burden of persuasion throughout the entire process, must demonstrate

"that the proffered reason was not the true reason for the employment decision."  Morris, 201

F.3d 793 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Defendant argues that Plaintiff has failed to establish the third and fourth elements of a

*prima facie* case of retaliation.  In response, Plaintiff argues that she was subjected to severe

and pervasive retaliatory harassment by her supervisor and that she has otherwise satisfied the

third and fourth elements of a *prima facie* case of retaliation.

While the Sixth Circuit has recognized a cause of action for retaliatory harassment,[7]

Plaintiff has failed to plead such a cause of action.  In her amended complaint, Plaintiff alleges

that she "opposed the unlawful practice of Defendant in sexually harassing Plaintiff by

---

[7]The Sixth Circuit has specifically recognized a claim of retaliatory harassment due to
"severe or pervasive retaliatory harassment by a supervisor."  Morris, 201 F.3d at 792.
However, the Sixth Circuit has not explicitly recognized a claim of retaliatory harassment due to
harassment by co-workers.  See Little v. BP Exploration & Oil Co., No. 02-4429, 2005 WL
977071, *2 (6th Cir. April 28, 2005).  But see Richmond-Hopes v. City of Cleveland, No. 97-
3595, 1998 WL 808222, *9 (6th Cir. Nov. 16, 1998) (noting that the United States Court of
Appeals for the Tenth Circuit had recognized a claim for retaliatory harassment by co-workers).

23

complaining to multiple agents of Defendant" and that, thereafter, she "was removed from her job position, offered non-comparable jobs, and was eventually terminated...." (Am. Compl. at ¶¶ 27-28). The amended complaint contains no allegations of retaliatory harassment. Therefore, this Court need only determine whether there was an adverse employment action and, if so, whether there is a causal connection between the adverse employment action and Plaintiff's complaints of sexual harassment.

The Sixth Circuit has defined an adverse employment action[8] as a "materially adverse change in the terms or conditions of ... employment because of [the] employer's conduct." Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996) (emphasis omitted). See also White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789, 795 (6th Cir. 2004). The Sixth Circuit has further described the requirements for establishing a materially adverse employment action: "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment...." Ford v. Gen. Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002) (citation omitted).

In this case, there is no dispute that, after a ninety day period of paid administrative leave following an investigation into Plaintiff's complaints of sexual harassment, Plaintiff's employment was terminated by Defendant. This Court therefore concludes that an adverse employment action was taken against Plaintiff.

---

[8]The Sixth Circuit has also noted that, although other courts, including the Supreme Court, use the terms "tangible employment action," those terms are equivalent to the terms "adverse employment action." White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789, 796, n. 1 (6th Cir. 2004).

24

Defendant argues, however, that there is no causal connection between Plaintiff's termination and her complaints of sexual harassment. As recognized by the Sixth Circuit, Plaintiff can establish a causal connection in two ways: (1) Plaintiff can offer direct evidence, or (2) Plaintiff can offer evidence that creates an inference of a causal connection. Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000)(quoting Parnell v. West, No. 95-2131, 1997 WL 271751, *2 (6th Cir. May 21, 1997)). Plaintiff has not offered any direct evidence of a causal connection between her termination and her complaints of sexual harassment.

Instead, Plaintiff argues that the temporal proximity of her termination to her complaints of sexual harassment creates an inference of a causal connection. The Sixth Circuit has repeatedly observed that, while temporal proximity may create an inference of causal connection, temporal proximity alone usually will not support such an inference.[9] Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1996)("The mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation"). See also Nguyen, 229 F.3d at 566; Fenton, 174 F.3d at 832 (quoting Moon v. Transport Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987)); Harrison-Pepper v. Miami University, No. 03-3322, 2004 WL 1532251, *5 (6th Cir. June 25, 2004); Mallory v. Noble Correctional Institute, No. 01-3302, 2002 WL 2020038 (6th Cir. Sept. 3, 2002); Parnell,1997 WL 2711751, *2-3).

_____

[9]The Sixth Circuit has explained that, the "reason for inferring a causal connection from retaliation that occurs very shortly after a protected Title VII activity is that in such a short period of time little other than the protected activity could motivate the retaliation." Mallory, 2002 WL 2020038, * 9. The greater the time between the protected activity and the adverse action, the less appropriate an inference of retaliation becomes. Miller v. Rudd, Case No. 2:97-cv-317, 2001 WL 242588, *19 (S.D. Ohio Feb. 6, 2001)(citation omitted).

25

In this case, Plaintiff relies solely on temporal proximity to establish a causal connection.  As was discussed *supra*, there was a period of ninety days between Plaintiff's complaints of sexual harassment to the Human Resources Department[10] and her termination. During that period of time, Defendant attempted to assist Plaintiff in transferring to another position at one of Defendant's facilities and offered to let Plaintiff return to her prior position at Riverside.  Plaintiff, however, failed to obtain another position during this time period and refused to return to her prior position.

This Court also notes that none of the employees that were involved in the alleged harassment took part in the decision to terminate Plaintiff's employment.  Additionally, it appears that Defendant, through its sexual harassment policy, encouraged complaints regarding allegations of sexual harassment.[11]  See Fenton, 174 F.3d at 832-33 ("'temporal proximity alone will not support an inference in the face of compelling evidence' that the defendant company encouraged complaints about the relevant grievance")(quoting Moon, 836 F.2d at 229).  Because Plaintiff has failed to produce any evidence, other than temporal proximity, this

---

[10]There is an even greater period of time between Plaintiff's complaints to Siconolfi and her termination.

[11]As was discussed *supra*, Defendant's sexual harassment provides:

> OhioHealth recognizes that harassment of any kind directed at an employee, including harassment of a sexual nature, is improper and will not be tolerated ...
>
> Any occurrence that you believe is contrary to this policy should be reported immediately to your supervisor and/or the Human Resources department to assure that appropriate actions are taken....

(Thaman Dep. Exhibit 21).

26

Court concludes that Plaintiff has failed to establish a causal connection between her complaints of sexual harassment and her termination.

Even if this Court could conclude that Plaintiff produced enough evidence to establish a *prima facie* case of retaliation, Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's termination.  As was discussed *supra*, following the investigation into Plaintiff's complaints of sexual harassment, Defendant allowed Plaintiff ninety days in which to either find a new position or return to her prior position.  Because Plaintiff failed to do either, her employment was terminated.

Plaintiff has offered no evidence that Defendant's stated reasons for terminating Plaintiff's employment were pretextual.  Therefore, Plaintiff's claim of retaliation is without merit.

### 3. Ohio Public Policy

Plaintiff has also asserted a public policy claim based on the alleged violations of Title VII and Ohio Revised Code § 4112.02.  Defendant argues that, because Plaintiff's statutory claims fail, the public policy claim must fail as well.  Alternatively, Defendant argues that, because Title VII and Ohio Revised Code § 4112.02 adequately protect society's interests, Plaintiff's public policy claim must fail.

This Court agrees that, where a statutory claim is without merit, a derivative public policy claim must fail as well.  Fenton, 174 F.3d at 834.  However, as was discussed *supra*, Plaintiff's statutory claims have, at least in part, survived Defendant's motion for summary judgment.  This Court therefore cannot dismiss Plaintiff's public policy claim on such a basis.

Defendant also argues that Plaintiff cannot maintain a claim for a violation of Ohio's

public policy when a statute exists which can adequately protect that public policy. The Ohio

Supreme Court first recognized an exception to the employment at will doctrine[12] for

terminations which violate public policy in Greeley v. Miami Valley Maintenance Contractors,

Inc., 49 Ohio St. 3d 228, 235 (1990). In order to prevail on such a claim ("Greeley claim"),

Plaintiff must establish:

> (1) a clear public policy manifested in the Ohio or United States
> Constitutions, a statute or administrative regulation, or in the
> common law (the "clarity element");
>
> (2) that the dismissal of employees under similar circumstances
> would jeopardize the public policy (the "jeopardy element");
>
> (3) that the discharge was motivated by conduct related to the
> public polity (the "causation element"); and
>
> (4) that the employer lacked a legitimate overriding business
> justification for the plaintiff's discharge (the "overriding
> justification element").

Collins v. Rizkana, 73 Ohio St. 3d 65, 69-70 (1995) (citation omitted). The clarity and

jeopardy elements are questions of law for the court to determine, while the causation and

overriding justification elements are questions of fact. Id. at 70.

Defendant asserts that the jeopardy element of Plaintiff's Greeley claim cannot be met

because Ohio Revised Code § 4112 provides a remedy to Plaintiff that adequately protects

---

[12]Under the common law doctrine of employment at will, employment of a person hired
for an indefinite period is "terminable at the will of either the employee or the employer . . . a
discharge without cause does not give rise to an action for damages." Wiles v. Medina Auto
Parts, 96 Ohio St. 3d 240, 241 (2002) (citing Collins v. Rizkana, 73 Ohio St. 3d 65, 67 (1995)).
However, the right to terminate employees at any time is not absolute. Fawcett v. G.C. Murphy
& Co., 46 Ohio St. 2d 245, 249 (1976). Employers cannot terminate employees for unlawful
reasons. Cavin v. Honda of Am. Mfg., Inc., 138 F. Supp. 2d 987, 990 (S.D. Ohio 2001) (citing
Mers v. Dispatch Printing Co., 19 Ohio St. 3d 100, 103 (1985)), rev'd on other grounds, 346
F.3d 713 (6th Cir. 2003).

28

Case: 2:03-cv-00210-JDH-TPK Doc #: 35 Filed: 06/29/05 Page: 29 of 34  PAGEID #: 448

Ohio's policy against sex discrimination.[13]  Plaintiff's <u>Greeley</u> claim is based, in part, on Ohio

Revised Code § 4112.02:

> It shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of ... sex ... to discharge without just cause ... or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Revised Code § 4112.02(A).  Moreover, Ohio Revised Code § 4112.99 provides that

"[w]hoever violates [§ 4112.02] ... is subject to a civil action for damages, injunctive relief, or

any other appropriate relief."

When analyzing the jeopardy element of a <u>Greeley</u> claim that is based upon a statute,

the issue is whether the remedies under the statute are adequate "to fully compensate an

aggrieved employee who is discharged . . . in violation of the statute."  <u>Kulch v. Structural</u>

<u>Fibers, Inc.</u>, 78 Ohio St. 3d 134, 155 (1997).  When a statute adequately protects society's

interest as expressed in the statute, the public policy is not jeopardized by the absence of a

recognized action for wrongful discharge.  <u>Wiles v. Medina Auto Parts</u>, 96 Ohio St. 3d 240,

244 (2002).

The Ohio Supreme Court has further explained that "'the issue of adequacy of

remedies' becomes a particularly important component of the jeopardy analysis" when a statute

is the source of the public policy in a plaintiff's <u>Greeley</u> claim and that statute provides both

rights and remedies to the plaintiff for its breach.  <u>Wiles</u>, 96 Ohio St. 3d at 244 (quoting

---

[13]Defendant does not challenge any of the other three elements of Plaintiff's <u>Greeley</u>
claim.

Collins, 73 Ohio St. 3d at 73).  Thus, the issue in this case is whether the absence of a Greeley claim based, in part, on Ohio Revised Code § 4112.02 would seriously compromise the statutory objectives of § 4112.02.

Plaintiff argues that the remedies available pursuant to Ohio Revised Code § 4112 are not sufficient to provide complete relief.  Plaintiff relies on Arthur v. Armco, Inc., 122 F. Supp.2d 876 (S.D. Ohio 2000).  In Arthur, the court held that the plaintiff was not precluded from maintaining an action for wrongful discharge in violation of Ohio's public policy against disability discrimination as manifested in Ohio Revised Code § 4112.02.  Id. at 879-80.

Arthur, however, was decided before the Supreme Court of Ohio decided Wiles.  In Wiles, the Ohio Supreme Court held that there is no need to recognize an action for wrongful discharge in violation of public policy when a statute exists that adequately protects that public policy.  Wiles, 96 Ohio St.3d at 244.  The Ohio Supreme Court then noted that the Family and Medical Leave Act ("FMLA") contained a "comprehensive remedial scheme designed to compensate an employee for his or her employer's violation of the Act" and held that, therefore, there could be no Greeley claim based on a violation of the FMLA.  Id. at 244-45.

Following Wiles, several Ohio Courts of Appeals have specifically held that a Greeley claim is unavailable for alleged violations of Ohio Revised Code § 4112.  See Lewis v. Fairview Hospital, 156 Ohio App. 3d 387 (Cuyahoga Cty. Ct. App. 2004) (finding that § 4112.99 contains remedies that adequately compensate an aggrieved employee for a violation of Ohio's discrimination laws); James v. Delphi Auto. Sys., No. 04AP-215, 2004 WL 2307825, at *9 (Franklin Cty. Ct. App. Oct. 14, 2004) (holding that remedies available in § 4112.99 "are sufficient to provide complete relief"); Barlowe v. AAAA Int'l Driving Sch., Inc., No. 19794,

30

2003 WL 22429543, at *7-8 (Montgomery Cty. Ct. App. Oct. 24, 2003) (concluding that "the remedies provided by [Ohio Revised Code §] 4112.99 provide broad relief which is sufficiently comprehensive to vindicate the policy goals set forth in that statute").

Moreover, in Carrasco v. NOAMTC, Inc., No. 03-4229, 2004 WL 2756838, at *7 (6th Cir. Dec. 1, 2004), the United States Court of Appeals for the Sixth Circuit affirmed the district court's dismissal of the plaintiff's claim of wrongful discharge in violation of Ohio's public policy because the remedies available under both Title VII and Ohio Revised Code § 4112 protected society's interests.

The Wiles decision and the many courts that have followed its analysis indicate that the remedies provided by Ohio Revised Code § 4112.99 adequately protect an Ohio citizen's right to be free from employment discrimination.  Thus, this Court cannot conclude that the public policy of Ohio would be in jeopardy if Plaintiff's Greeley claim was not recognized. Therefore, because Plaintiff has failed to establish the jeopardy element of her Greeley claim, Defendant is entitled to summary judgment with respect to that claim.

### 4. Infliction of Emotional Distress

Finally, Plaintiff has asserted a claim of intentional infliction of emotional distress. Ohio courts have relied upon the Restatement in formulating a standard of review for claims of intentional infliction of emotional distress: "'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" Yeager v. Local Union 20, 6 Ohio St.3d 369, 374 (1983) (quoting Restatement (Second) of Torts, § 46(1) at 71 (1965 )); see also Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 376 (6th

Cir. 1999).  In order to survive Defendant's motion for summary judgment, Plaintiff must, *inter alia*, present evidence sufficient to create a genuine issue of material fact with respect to the nature of Defendant's conduct, *i.e.,* whether it was extreme and outrageous.  Watkins v. Millennium School, 290 F. Supp.2d 890, 903 (S.D. Ohio 2003).  See also Knapp v. City of Columbus, Case No. 2:01-cv-255, 2002 WL 193849, *8 (S.D. Ohio Jan. 17, 2002)(citations omitted).

Liability for intentional infliction of emotional distress is found only where the conduct is so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Yeager, 6 Ohio St.3d at 374-75 (quoting Restatement (Second) of Torts, § 46(1), cmt. d at 73 (1965)); see also Godfredson, 173 F.3d at 376.  "'Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Greenwood v. Delphi Automotive Systems, Inc., 257 F. Supp.2d 1047, 1072 (S.D. Ohio 2003)(quoting Yeager, 6 Ohio St.3d at 374-75 (citations omitted)).

In Greenwood, the plaintiff had been subjected to an unwanted massage, as well as numerous sexual comments.  The court held that, while the conduct was clearly inappropriate and constituted "insults, indignities, and annoyances," it did not rise to the level of extreme and outrageous.  Greenwood, 257 F. Supp.2d at 1073-74.   In support of this holding, the court in Greenwood cited a number of Ohio courts that had specifically addressed claims of intentional infliction of emotional distress based on sexually harassing conduct.  Id. (citing Summerville v. Ross/ Abott Laboratories, No. 98-3517, 1999 WL 623786 (6th Cir. Aug. 10, 1999) ("unwelcome lewd jokes, comments, body movements and baring of body parts, as well as

32

sexual come-ons and unwelcome touching" did not constitute extreme and outrageous conduct); Griswold v. Fresenius USA, Inc., 964 F. Supp. 1166, 1174-75 (N.D. Ohio 1997)(unwanted touching as well as inappropriate gestures and comments, that persisted for more than a year and a half, did not constitute extreme and outrageous conduct); Perry v. Textron, Inc., No. C-960755, 1997 WL 598398 (Hamilton Cty. Ct. App. Sept. 26, 1997)(co-worker's conduct of touching plaintiff's hands and upper thigh did not constitute outrageous behavior); Retterer v. Whirlpool Corp., 111 Ohio App.3d 847, 856 (Marion Cty. Ct. App. 1996)(receipt of blow-up dolls, cartoons, and an item labeled a "penis warmer" were insufficient to establish extreme and outrageous conduct)).

In this case, Plaintiff complains of numerous sexually related comments and brief touching.  While these allegations are certainly inappropriate, as was noted by Williamson, (Williamson Dep. at p. 64), this Court cannot conclude that they rise to the level of extreme and outrageous.  The fact that the alleged harassment occurred over a period of almost a year and a half and, as Plaintiff alleges, was ignored by her supervisor, does not change this result.  See Miller v. Denny's Inc., Case No. 1:99-cv-2 (N.D. Ohio April 13, 1999)(attached to Plaintiff's Notice of Filing Exhibits, Exhibit 21).

Moreover, with respect to Plaintiff's termination, Ohio courts have consistently held that an adverse employment action, even if based on discrimination, is not extreme and outrageous conduct without proof of something more.  Godfredson, 173 F.3d at 376.   This Court therefore concludes that Plaintiff's claim of intentional infliction of emotional distress is without merit.

33

**WHEREUPON** Defendant's motion for summary judgment (Doc. # 14) is **GRANTED** in part and **DENIED** in part.  More specifically, with respect to Plaintiff's claims of co-worker sexual harassment asserted pursuant to Title VII and Ohio Revised Code § 4112, Defendant's motion is **GRANTED** in part and **DENIED** in part.  To the extent that Plaintiff's claims of co-worker sexual harassment are based on the four complaints that Siconolfi admits to receiving, as was discussed *supra*, Defendant's motion is **GRANTED**.  To the extent that Plaintiff's claims of co-worker sexual harassment are based on complaints that Siconolfi denies receiving, as was discussed *supra*, Defendant's motion is **DENIED**.

Additionally, with respect to Plaintiff's Title VII claim of retaliation, her claim of violation of Ohio's public policy and her state law claim of intentional infliction of emotional distress, Defendant's motion is **GRANTED**.  This Court also notes that Plaintiff's claims of supervisor sexual harassment remain pending.

**IT IS SO ORDERED.**

June 29, 2005                                  /s/ John D. Holschuh
                                               John D. Holschuh, Judge
                                               United States District Court

34
