**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CATHERINE THAMAN,** | : | |
| **Plaintiff,** | : | **Case No. 2:03-cv-210** |
| **v.** | : | **Judge Holschuh** |
| **OHIOHEALTH CORPORATION,** | : | **Magistrate Judge Kemp** |
| **Defendant.** | : | |
| | : | |

**Memorandum Opinion and Order**

Trial in this case is currently scheduled for December 5, 2005.  This matter is before the Court on the following motions *in limine*: (1) Plaintiff's first motion *in limine* which seeks to exclude a one-page typed letter (Doc. # 42); (2) Plaintiff's second motion *in limine* which seeks to exclude certain administrative agency determinations (Doc. #45); (3) Defendant's first motion *in limine* which seeks to prevent Plaintiff from introducing any evidence of, or seeking economic damages based on her separation from employment with Defendant (Doc. # 43); and finally, Defendant's second motion *in limine* which seeks to exclude certain witnesses identified by Plaintiff whose testimony allegedly will relate solely to claims already dismissed by this court (Doc. # 44).

**I.  Background**

On September 12, 1999, Plaintiff was hired by Defendant to work as an administrative assistant in the Facilities Engineering Department at Riverside United Methodist Hospital.  Patrick Siconolfi, Director of the Facilities Engineering Department, was Plaintiff's direct supervisor.  During orientation, Plaintiff signed a document acknowledging the receipt of the

OhioHealth Employment Handbook, which included Defendant's policy on sexual harassment in the workplace. Defendant's sexual harassment policy provides in relevant part:

> OhioHealth recognizes that harassment of any kind directed at an employee, including harassment of a sexual nature, is improper and will not be tolerated ...
>
> Our policy does not prohibit you from engaging in normal social relationships with your co-workers. Our policy does prohibit you, however, from making unwelcome advances or requests for favors, both verbal or physical, of a sexual nature... Lastly, such conduct is prohibited if it interferes with the staff member's work performance or creates an intimidating, hostile, or offensive working environment.
>
> Any occurrence that you believe is contrary to this policy should be reported immediately to your supervisor and/or the Human Resources department to assure that appropriate actions are taken....

(Exhibit 21, attached to Deposition of Catherine Thaman). Plaintiff admits that she read the Employee Handbook and knew of the sexual harassment policy.

Plaintiff alleges that shortly after she began working for Defendant, Siconolfi warned her that she might have "problems with three or four guys in the department." Plaintiff contends that Siconolfi also told her to let him know if anything did happen so that he could "deal with the situation harshly." Siconolfi, however, denies making these statements.

Plaintiff alleges that, within the first two weeks of work, she began to experience sexual harassment that continued throughout her employment. Plaintiff alleges that she experienced "unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature." Plaintiff contends that, over the course of her employment, she made numerous complaints to Siconolfi regarding her allegations of sexual harassment. Siconolfi admits to receiving, and specifically dealing with, four complaints made by Plaintiff. Siconolfi, however, denies knowledge of any other complaints

2

of sexual harassment made by Plaintiff.

### A.  Complaints Siconolfi Admits Receiving

Plaintiff explains that the first incident of sexual harassment occurred when a co-worker approached her and commented that "I'd give anything if I knew you better right now." Plaintiff responded that she did not appreciate the comment and asked the co-worker to stay away from her.  Plaintiff alleges that the co-worker then poked her in the waist and followed her into her office.  Plaintiff reported this incident to the co-worker's supervisor who advised Plaintiff to report the incident as a diversity issue to a diversity liaison.[1]

Plaintiff also informed Siconolfi, who reassured her that the situation would be dealt with.  Siconolfi contends that he discussed the situation with Plaintiff's co-worker.  Plaintiff admits that the co-worker apologized and that she did not encounter any problems with that co-worker thereafter.

 Plaintiff also claims that her co-workers would make lewd and inappropriate faces and gestures to her through a window in her office.  Siconolfi contends that he dealt with the situation by discussing the matter with the co-workers' supervisor and by instructing Plaintiff to keep her office blinds closed.

Another incident arose when a co-worker, considered by Plaintiff to be a friend, was conversing with the Plaintiff about the Plaintiff's loss of weight.  During the course of the conversation, the co-worker asked Plaintiff the size of her breasts and whether they were real. Plaintiff, feeling uncomfortable, asked Siconolfi for his assistance.  However, Plaintiff

---

[1]Siconolfi explained that a diversity liaison is an employee that has received training to deal with "diversity" issues within the department.  Diversity issues include, *inter alia*, allegations of sexual harassment.

specifically requested that Siconolfi not mention the comment to the co-worker because Plaintiff did not want to make a complaint and wanted to deal with the situation on her own. Against Plaintiff's wishes, Siconolfi confronted the co-worker; the co-worker was also reprimanded by his own supervisor.

Plaintiff alleges that this incident ultimately led to further harassment which manifested itself in the form of co-workers taking bets on Plaintiff's bra size.  Plaintiff, upset by the continuous hectoring, informed Siconolfi about the incident and he allowed her to stay in his office until she calmed down.  Siconolfi later instructed Plaintiff to speak with a diversity liaison about the situation.  After the diversity liaison spoke with the co-worker who had initiated and promoted the bets, the co-worker made a barren attempt, according to Plaintiff,  to apologize: "I didn't mean to hurt your feelings and, plus, I don't think your breasts are really that big."  Plaintiff refused to accept the apology and informed Siconolfi.   Siconolfi admits to referring Plaintiff to the diversity liaison in order to resolve the problem, but he cannot recall Plaintiff informing him of the allegedly deficient apology.

### B.  Complaints Siconolfi Denies Receiving

Plaintiff claims to have experienced many other uncomfortable, sexually harassing situations while working for Defendant.  As was discussed *supra*, Plaintiff admits that her first complaint regarding sexual harassment was resolved.  However, Plaintiff alleges that the particular co-worker's supervisor, along with the diversity liaison, improperly notified other employees of the incident.  Plaintiff alleges that other co-workers thereafter harassed her about the incident for several weeks, were rude to her when she called them about a job, and refused to return her pages.  Plaintiff contends that she complained about this treatment to Siconolfi

who allegedly told her to "just to give it some time."

Plaintiff also claims that the diversity liaison had once pinned her against a wall, leaned in to her, and whispered "[d]o you consider this a diversity issue."  Again, Plaintiff alleges that Siconolfi told her that he would deal with the situation, but, to Plaintiff's knowledge, nothing was ever done.  Siconolfi denies having knowledge of this particular statement and behavior, but he does admit to knowing that there was an incident between Plaintiff and the diversity liaison.

Plaintiff claims that she was asked constantly whether she wore underwear, whether she had an attractive sister or daughter, and why she did not dress in a more revealing manner. Plaintiff alleges that Siconolfi appeared amused when she apprised him of the comments made about her bra and panties and responded with "boys will be boys."

Plaintiff also claims that a co-worker rubbed her back fairly often, despite her efforts to make him stop.  Plaintiff alleges that she informed both Siconolfi and the co-worker's supervisor, as well as another supervisor that she trusted, but that the situation continued because, as Plaintiff alleges, nothing was done to correct the situation.  Siconolfi denies being informed of this.

Plaintiff also asserts that co-workers made multiple inappropriate comments to her including: that she had nice legs and that the co-worker would love to climb them; "[y]ou could chain me up and strip me down and I would be your love slave"; "I would do just about anything to see you naked"; "I would love it if you would tie me up and beat me with a whip"; "I love coming in the office just to smell you";"my, don't we look perky today [a]nd...I'm not talking about your smile"; and that Plaintiff wanted a co-worker's "winky."

Plaintiff claims that even Siconolfi made an inappropriate comment at an office lunch when he was asked why he had hired Plaintiff.  Siconolfi allegedly responded that he had hired Plaintiff because of "[her] personality and [her] big, umm, nails," all while looking at the Plaintiff's breasts.  However, Siconolfi does not recall making this comment.

In March, 2001, Siconolfi assured Plaintiff that, when she returned to her job from a scheduled medical leave, things would be much better.   However, when Plaintiff eventually returned to work, she alleges that the situation had not gotten any better and, if anything, had intensified.  Plaintiff contends that word of the bra incident had circulated amongst her co-workers, and workers refused to accept work and phone calls from the Plaintiff.  Siconolfi denies telling Plaintiff that things would be better when she returned, and he denies receiving any complaint from Plaintiff that she was continually sexually harassed once she returned from her medical leave.  This prompted Plaintiff to contact Human Resources for the first time in April, 2001, to make a formal complaint about the harassment that had been going on for nearly a year and a half.

### C.  Plaintiff's Complaint to Human Resources

On April 19, 2001, Plaintiff met with Bonita Williamson, an Employee Relations Manger in the Human Resources Department at Riverside.  Plaintiff gave Williamson a partial list of incidents that Plaintiff alleged to be sexual harassment.  Plaintiff concedes that Williamson was very sympathetic and comforting during the meeting.  Williamson noted Plaintiff's allegations and instructed Plaintiff to go home; Williamson indicated that she would contact Plaintiff the next business day to inform her as to how to proceed.

After the initial meeting, Williamson spoke with her boss, Don Boswell, Vice President

of Human Resources, and Siconolfi's boss, Ed Cotter, Senior Operating Officer, about the situation and the need for an investigation.  Williamson also suggested that Plaintiff be placed on paid administrative leave during the investigation.

Williamson then contacted Plaintiff and told her that an investigation would be conducted and that Plaintiff had been approved for administrative leave.  According to Plaintiff, Williamson informed her that she was approved for temporary leave and about a week later, Jim Schmidt, an employee in the Human Resources Department who was also working with Williamson on the investigation, called Plaintiff to inform her that permanent administrative leave had been approved.  Plaintiff was informed that she would be placed on permanent administrative leave until she found another job within the company or until the expiration of a ninety (90) day period.

Problems soon arose when Plaintiff did not receive her paycheck.  After calling the Payroll Department, Plaintiff discovered that her time had been deleted from the payroll system. Plaintiff then contacted Williamson to complain, to remind Williamson that Plaintiff thought this might happen, and to allege that this was retaliation against her.  Plaintiff alleges that Williamson indicated that she agreed with Plaintiff and that she would "deal with it." Plaintiff concedes that the problem was resolved.

 Williamson also informed Plaintiff that, during her period of administrative leave, Jamie Bihl, a Human Resources representative, would be sending Plaintiff job postings from within the company.  Plaintiff admits that she received job postings but claims that she did not apply for any of the posted positions because they were below her "hiring rate."  Plaintiff contends that she did inquire with Bihl about one position, an executive assistant position in

Human Resources, but was told that it was no longer available.

In the meantime, Williamson organized and implemented, with the help of Schmidt, an investigation into Plaintiff's allegations of sexual harassment.[2]  Williamson and Schmidt interviewed the persons identified by Plaintiff as alleged harassers.  These witnesses recounted incidents where Plaintiff's behavior was inappropriate and where Plaintiff willingly participated with the men in the office banter.  In fact, several witnesses claimed that Plaintiff had initiated most of the situations of which she complained.

Due to the lack of consistency between Plaintiff's version of the facts and the witnesses' accounts of the situation, Williamson and Schmidt developed follow-up questions for Plaintiff to answer.  On May 18, 2001, Williamson and Schmidt administered the follow-up questions and informed Plaintiff of the results and findings of their investigation.

As a result of the investigation, Williamson concluded that inappropriate behavior had occurred, but that all parties involved, including Plaintiff, had participated in it.  Williamson informed Plaintiff that sexual harassment and hostile work environment training would be recommended for employees in the Facilities Engineering Department.  Sexual harassment training was in fact given to employees in November 2001.

After concluding the investigation, Plaintiff was given an additional ninety (90) day period of paid administrative leave in order to find employment within the company.  Additionally, Williamson told Plaintiff that, if she wanted to go back to her prior position, it

_____

[2]Williamson also indicated that Carolyn Waring assisted in the investigation.

was available.[3]  However, Plaintiff made it clear that she did not want to return to her prior position.

During Plaintiff's additional ninety days of paid administrative leave, Defendant sent Plaintiff weekly job postings to assist her in locating another position.  The job postings sent to Plaintiff included all OhioHealth locations and Plaintiff testified that there were several jobs at or above her prior level of employment.  Additionally, Plaintiff testified that Schmidt was very cooperative in providing details regarding the various job postings.

Plaintiff concedes that she did not submit any transfer requests to Schmidt as instructed.  However, Plaintiff apparently did discuss an employee relations position at Riverside with Williamson.  Plaintiff, however, alleges that Williamson and Schmidt strongly discouraged her from applying for any positions at Riverside.  Plaintiff also interviewed for a position at Doctor's Hospital.  However, Plaintiff speculates that she was not hired because, when asked, she told the interviewer that she had left Riverside due to sexual harassment.

On August 10, 2001, Williamson met with Plaintiff to discuss the status of Plaintiff's job search.  Plaintiff expressed concern about losing her job because she had not yet found a new position.  Williamson allegedly told Plaintiff that she would not lose her job, but that Williamson would have to contact the Legal Department regarding the situation.  Although Williamson contacted the Legal Department within the week before Plaintiff's ninety day period of paid administrative leave expired, the ultimate decision to extend Plaintiff's administrative leave rested with Cotter.  Williamson recommended extending Plaintiff's

---

[3]Further, Williamson instructed Siconolfi to hold Plaintiff's position open for her until the expiration of the ninety (90) day period.

administrative leave for thirty (30) additional days, but Cotter did not allow the extension.

On August 28, 2001, Plaintiff received a letter from Williamson informing her that her employment had been terminated.  The letter also stated that Plaintiff was eligible for re-hire and that Plaintiff should continue to look for jobs with OhioHealth.  Plaintiff alleges that she did in fact  submit resumes to OhioHealth through its website after her termination, but did not receive a response from Defendant.

## II.  Procedural History

Plaintiff filed suit on March 10, 2003.  Thereafter, Plaintiff filed an amended complaint on March 19, 2003.  On March 29, 2004, Defendant filed its motion for summary judgment. Response and Reply briefs were filed and, on June 29, 2005, this Court granted in part and denied in part the motion for summary judgment.  Initially, the Court noted that it appeared that Plaintiff had asserted both co-worker sexual harassment claims and supervisor sexual harassment claims.[4]  This Court then noted that Defendant had not moved for summary judgment with respect to the supervisor sexual harassment claims.

With respect to the co-worker sexual harassment claims, this Court granted in part and denied in part Defendant's motion for summary judgment.  This Court held that, with respect to the complaints of sexual harassment that Siconolfi admits receiving, Siconolfi adequately responded to those complaints and, therefore, Defendant could not be held liable for the alleged sexual harassment.  However, with respect to those complaints of sexual harassment that Siconolfi denied receiving, an issue of fact remains as to whether Defendant had notice of the

---

[4]During the Final Pretrial Conference, counsel for Plaintiff confirmed that Plaintiff intended to assert both co-worker sexual harassment claims and supervisor sexual harassment claims.

alleged sexual harassment such that liability may be imposed.  This Court noted that, if

Siconolfi did in fact have knowledge of Plaintiff's other complaints of sexual harassment, then

it may be that the response by the Human Resources Department was neither prompt nor

reasonable.

### III.  Discussion

Both parties have filed motions *in limine* seeking to exclude certain evidence from trial.

The purpose of a motion *in limine* is to ensure the evenhanded and expeditious management of

trials by eliminating evidence that is clearly inadmissible.  See Indiana Ins. Co. v. General Elec.

Co., 326 F. Supp.2d 844, 846 (N.D. Ohio 2004) (citing Jonasson v. Lutheran Child and Family

Serv., 115 F.3d 436, 440 (7th Cir. 1997)).  A court should only exclude evidence on a motion *in*

*limine* when that evidence is determined to be clearly inadmissible.  Indiana Ins. Co., 326 F.

Supp.2d at 846.  When a court is unable to determine whether or not certain evidence is clearly

inadmissible, evidentiary rulings should be deferred until trial so that questions of foundation,

relevancy and potential prejudice can be resolved in the proper context.[5]  Id.

### A.  Plaintiff's First Motion *In Limine*

In her first motion *in limine*, Plaintiff seeks to exclude a one-page typed letter, dated

December 22, 2002, to the "Chief Executive Officer" at Riverside Methodist Hospital from

"Patrick B. Hanna" (hereinafter "Hanna letter").  Plaintiff contends that the Hanna letter

---

[5]Thus, the denial of a motion *in limine* does not necessarily mean that the evidence will
be admitted at trial over the objection of the opposing party; the Court will entertain any
objections to a proffer of evidence during trial, even if the proffer falls within the scope of a
denied motion *in limine*.  Indiana Ins. Co., 326 F. Supp.2d at 846.

constitutes inadmissible hearsay, is irrelevant, is improper character evidence[6] and should

otherwise be barred by Rule 403 of the Federal Rules of Evidence.  Defendant responds that the

Hanna letter would not be offered for a hearsay purpose and is clearly relevant and highly

probative with respect to Plaintiff's underlying mental state.

### 1.  Relevance

Initially, Plaintiff contends that the Hanna letter should be excluded as irrelevant

evidence.  Rule 402 of the Federal Rules of Evidence provides that relevant evidence is

generally admissible, but that evidence which is not relevant is not admissible.  Rule 401 of the

Federal Rules of Evidence defines "relevant evidence" as being that which has "any tendency

to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence."

The contents of the Hanna letter suggest that Plaintiff is a "scam artist" and that

Plaintiff's complaints of sexual harassment are without merit.  Additionally, Defendant

contends that the Hanna letter is relevant to show Plaintiff's poor relationship with her mother.

Defendant contends that the Hanna letter was actually written by Plaintiff's mother[7] and would

give the jury insight into the mother-daughter relationship in this case.  Defendant argues that

this poor relationship is relevant because it is a possible source of the emotional distress

claimed by Plaintiff.  Defendant speculates that the Hanna letter will also have probative value

---

[6]Plaintiff's reliance on Rule 608 of the Federal Rules of Evidence appears to be
premature.  For instance, opinion and reputation evidence of character are only admissible after
the character of the witness for truthfulness has been attacked.  Additionally, extrinsic evidence
can only be introduced on cross-examination.  See Fed. R. Evid. 608.

[7]Plaintiff has testified that she believes that the Hanna letter was written by her mother.
(Thaman Dep. at p. 205).

12

with respect to the expected testimony of Plaintiff's treating psychologist, Dr. Joan Simon.

This Court concludes that the Hanna letter is arguably relevant, as a technical matter, to Plaintiff's claim of sexual harassment and to Defendant's assertion that Plaintiff was a "willing participant" in any alleged sexual misconduct.

### 2.  Hearsay

Plaintiff also contends that the Hanna letter constitutes inadmissible hearsay.  Pursuant to Rule 801 of the Federal Rules of Evidence, "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  A "statement" is an oral or written assertion, and a "declarant" is a person who makes a statement.  Fed. R. Evid. 801.  Rule 802 provides that hearsay is generally inadmissible.  Fed. R. Evid. 802.

Defendant concedes that the Hanna letter is an out-of-court statement.  Defendant, however, contends that the Hanna letter is not being offered for its truth, but instead, to show a poor relationship between Plaintiff and her mother that may have contributed to Plaintiff's alleged emotional distress.  There is nothing presented to the Court, however, to show that an alleged strained relationship between Plaintiff and her mother did in fact contribute to Plaintiff's alleged emotional distress attributable to the issue of sexual harassment in this case. In any event, as set forth below, even if technically relevant and conceivably not hearsay, the Hanna letter is not admissible.

13

### 3. Rule 403

Plaintiff argues that, even if the Hanna letter is relevant and does not constitute hearsay, it nevertheless should be barred by Rule 403 of the Federal Rules of Evidence.  Rule 403 provides that a court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, ...."

Defendant notes that, in this case, Plaintiff claims that the alleged sexual harassment caused her to suffer emotional distress.  Defendant contends that any alleged emotional distress suffered by Plaintiff was caused, at least in part, by Plaintiff's strained relationship with her mother.  Defendant therefore contends that the Hanna letter is highly probative of Plaintiff's emotional state and her damages and therefore should be admitted over Plaintiff's objection. Plaintiff, on the other hand, argues that the contents of the Hanna letter will certainly inflame the jury and/or otherwise confuse the jury.

This Court agrees that the probative value of the Hanna letter, if any, is substantially outweighed by the risk of unfair prejudice.  As was discussed *supra*, the only admissible purpose, as identified by Defendant, is to demonstrate an alleged poor relationship between Plaintiff and her mother.  However, this Court initially notes that it has not been established that the Hanna letter was in fact written by Plaintiff's mother.[8]

The risk that the Hanna letter will cause unfair prejudice and/or otherwise confuse the jury is obvious.  The Hanna letter claims that Plaintiff is a "scam artist" and that her claims of

---

[8]As was noted *supra*, Plaintiff has merely testified that she believes that the Hanna letter was written by her mother.  (Thaman Dep. at p. 205).

14

sexual harassment are without merit. The Hanna letter also describes Plaintiff as a "user" who has been in trouble from early childhood and that she enjoys dressing half nude and using vulgar speech. Even with a limiting instruction, it would be virtually impossible for a jury to ignore the accusations contained in the Hanna letter.

Defendant also offers that such evidence will be used to rebut expected testimony of Plaintiff's treating psychologist, Dr. Simon. Again, however, this Court cannot conclude that the probative value of the Hanna letter substantially outweighs the risk of unfair prejudice. Therefore, this Court concludes that Plaintiff's first motion *in limine* has merit and the Hanna letter will be excluded from the evidence.

### B. Plaintiff's Second Motion *In Limine*

In her second motion *in limine*, Plaintiff seeks to exclude the October 10, 2002 "No Probable Cause" letter of the Ohio Civil Rights Commission ("OCRC") and the December 9, 2002 "Right to Sue" letter of the Equal Employment Opportunity Commission ("EEOC"). Plaintiff argues that the probative value of these documents is substantially outweighed by the risk of unfair prejudice. Defendant responds that the evidence is clearly relevant to Plaintiff's sexual harassment claims and therefore should be admitted.

The Sixth Circuit has recognized that, in a Title VII action, a district court has discretion to allow or disallow findings from an administrative agency such as the EEOC or the OCRC. See Heard v. Mueller Co., 464 F.2d 190, 194 (6th Cir. 1972). See also Kesselring v. United Technologies Corp., 753 F. Supp. 1359, 1368-69 (S.D. Ohio 1991). Additionally a panel of the Sixth Circuit, albeit in an unpublished opinion, acknowledge the authority of a district court to adopt a *per se* rule of inadmissibility. See EEOC v. Ford Motor Co., No. 95-

15

3019, 1996 WL 557800 (6th Cir. Sept. 30, 1996).

This Court has not adopted a *per se* rule of either admissibility or inadmissibility with respect to administrative agency determinations in a Title VII case. See Harden v. Dayton Human Rehabilitation Center, 520 F. Supp. 769, 773 (S.D. Ohio 1981), aff'd, 779 F.2d 50 (6th Cir. 1985). Nevertheless, this Court agrees that, in this case, the probative value of the EEOC Right to Sue Letter and the OCRC No Probable Cause letter is substantially outweighed by the risk of unfair prejudice. As was discussed *supra*, Rule 403 allows exclusion of relevant evidence where the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Fed. R. Evid. 403.

Although the claims before the OCRC and EEOC appear to be the same as the claims asserted in this case, this Court concludes that the letters are of little probative value. First, this Court notes that the OCRC apparently rejected Plaintiff's claims, at least in part, because she had not filed her claim within six months. The EEOC merely adopted, in conclusory fashion, the findings of the OCRC. Additionally, even though the OCRC letter goes on to discuss the merits of Plaintiff's claims, the OCRC's conclusions appear to be based almost exclusively on the investigation conducted by Defendant.

The risk of unfair prejudice in this case is that the jury will simply adopt the conclusions of the OCRC and EEOC. As noted by Plaintiff, to allow the letters in this case would be, in essence, to allow the "opinion of experts who had considered only a very small and factional part of the relevant evidence...." See Kesselring, 753 F. Supp. at 1369. This Court therefore concludes that the probative value of the EEOC Right to Sue Letter and the OCRC No Probable Cause letter is substantially outweighed by the risk of unfair prejudice and

16

those documents will be excluded from the evidence.

### C.  Defendant's First Motion *In Limine*

In Defendant's first motion *in limine*, Defendant seeks to prevent Plaintiff from introducing any evidence of, or seeking economic damages based on, Defendant's termination of Plaintiff from her employment.  Defendant notes that in the Final Pretrial Order Plaintiff indicates that she intends to seek damages, including back pay, retirement benefits, dental coverage and front pay, against Defendant based on her termination from employment.  Defendant argues that this Court has already determined that there was no connection between the alleged harassment and Plaintiff's termination from employment.  Defendant therefore contends that it cannot be held responsible for any alleged economic impact of Plaintiff's lawful termination.

Plaintiff responds that her claim of hostile work environment sexual harassment remains pending and that damages such as back pay, lost benefits and front pay are generally available in such actions.  In support of her position, Plaintiff discusses the 1991 amendments to the Civil Rights Act and notes that the amendments only limit the amount of compensatory and punitive damages.  Plaintiff concludes that, "as long as Title VII allegations remain to present to the jury at the trial of this matter, Plaintiff is lawfully entitled to pursue all available remedies afforded to her under Title VII that would not have otherwise occurred but for the employer's unlawful Title VII prohibited discriminatory conduct."  (Plaintiff's Memorandum in Opposition at p. 6).

Plaintiff is correct that damages such as back pay, lost benefits and front pay are generally available remedies in a Title VII hostile work environment case.  See 42 U.S.C. §

17

2000e-5(g)(1) ("the court may ... order such affirmative action as may be appropriate, which

may include, but is not limited to, reinstatement or hiring of employees, with or without back

pay ..., or any other equitable relief as the court deems appropriate").  See also Pennsylvania

State Police v. Suders, 542 U.S. 129, 147, n. 8 (2004) (citations omitted).  However, in order to

recover such damages, Plaintiff must establish a causal connection between the alleged

harassment and her separation from employment.  See Mitchell v. OsAir, Inc., 629 F. Supp.

636, 644 (N.D. Ohio 1986) (concluding that, because the plaintiff's termination was unrelated

to the sexual harassment she suffered, she could not be awarded back pay, front pay, or

reinstatement).

Contrary to Defendant's suggestion, this Court did not hold that there was no

connection between the alleged sexual harassment and Plaintiff's termination.  The prior

Memorandum and Order granting summary judgment to Defendant with respect to Plaintiff's

allegations of co-worker sexual harassment sharply differentiated between the four claims that

Siconolfi admitted receiving and the remaining claims that Siconolfi allegedly ignored.  With

respect to the four claims that Siconolfi admitted receiving, the Court concluded that

Defendant's response was both prompt and reasonable.

With respect to the claims of co-worker sexual harassment that Siconolfi denies

receiving, however, this Court concluded that a genuine issue of material fact remained.  This

Court concluded that, if Siconolfi was in fact aware of the other complaints made by Plaintiff

and did nothing in response, "then it may be that the response by the Human Resources

18

Department was neither prompt nor reasonable."[9]  (<u>Memorandum and Order</u> at p. 20 (June 29, 2005)).  For example, if nothing was done at the time, Defendant's response through the Human Resources Department could be found to be not prompt and the remedy could be found to be unreasonable in light of numerous unheeded complaints with no disciplinary action against the harassing co-workers, a refusal to extend Plaintiff's administrative leave, and a termination of Plaintiff's employment.

Furthermore, it is undisputed that Defendant did not move for summary judgment on Plaintiff's claims of supervisor sexual harassment.  If found to be valid, such claims could result in the conclusion that the action taken by the Human Resources Department was not only late but was unreasonable, and the termination of Plaintiff was unwarranted.

With respect to Plaintiff's claim of retaliation, the Court, in its earlier Memorandum and Order, granted Defendant's motion for summary judgment because there was no direct or circumstantial evidence presented to make a jury issue on the question of whether Defendant discharged Plaintiff in retaliation for Plaintiff having made claims of sexual harassment during her employment.  It seemed obvious to the Court then, as it does now, that Plaintiff's claim of retaliation had no merit for the reasons stated in the Memorandum and Order.

Plaintiff clearly was terminated by Defendant for the reason given by Defendant, *i.e.*, Plaintiff's failure to either find a new position or return to her prior position within 90 days, and not in retaliation for Plaintiff's claims of sexual harassment.  The Court's prior discussion of a "causal connection" was confined to Plaintiff's retaliation claim; this Court merely

---

[9]The Court noted that, "notice to a supervisory employee can be imputed to the employer."  (<u>Memorandum and Order</u> at p. 20 (citing <u>Pierce</u>, 40 F.3d at 804)).

concluded that there was an insufficient causal connection between Plaintiff's complaints of sexual harassment and her termination in order to support a claim of retaliation. (Memorandum and Order at pp. 26-27 (June 29, 2005)). In particular, this Court noted that, with respect to Plaintiff's retaliatory discharge claim, Plaintiff appeared to rely exclusively on the temporal proximity between her complaints of sexual harassment and her termination. (Id. at p. 26). This Court held that temporal proximity, alone, was not sufficient to support a retaliatory discharge claim, especially in the face of evidence that Defendant encouraged complaints about sexual harassment.[10] (Id. at pp. 26-27 (citing Fenton, 174 F.3d at 832-33)).

The fact that this Court found no retaliatory termination, however, does not preclude a finding that the alleged harassment was connected to the adverse employment action. For instance, although not the typical case, the facts of this case present a situation much like a constructive discharge as recognized in Suders, 542 U.S. 129. In the present case, Plaintiff was placed on paid administrative leave and was told that she must find alternate employment with the company within 90 days. While Plaintiff received job postings from Defendant, Plaintiff testified that the vast majority of those postings were below her current level of employment. Moreover, Plaintiff was apparently told that she should not seek employment at Riverside because Defendant could not "guarantee her safety." (Thaman Dep. at p. 90).

Under these circumstances, Plaintiff will not be precluded from presenting evidence regarding back pay, lost benefits and front pay. Defendant's first motion *in limine* is therefore

---

[10]While this Court did note that Defendant had offered a legitimate, nondiscriminatory reason for Plaintiff's termination, this finding was solely within the context of Plaintiff's claim of a retaliatory discharge and her failure to establish a *prima facie* case of retaliatory discharge. The question of whether the termination was reasonable under the circumstances of this case, however, remains an issue that was not decided by the Court's prior Memorandum and Order.

20

without merit.

### D.  Defendant's Second Motion *In Limine*

In Defendant's second motion *in limine*, Defendant seeks to exclude certain witnesses identified by Plaintiff whose testimony allegedly will relate solely to claims already dismissed by this court.  Defendant has identified the following witnesses whose testimony, Defendant contends, will relate solely to issues that the Court has already dismissed: (1) Joe Forquer, (2) Jamie Bihl, (3) Ed Cotter, and (4) Lisa Loerner.[11]  Defendant contends that Forquer's testimony will relate to the Gaunder sexual harassment incident which this Court dismissed.  Additionally, Defendant contends that the other three witnesses' testimony will relate to Plaintiff's 90-day paid leave/job transfer period and her subsequent termination, which Defendant contends are no longer relevant.

Generally, this Court agrees that Plaintiff will not be permitted to present testimony regarding claims that have been dismissed.  Plaintiff's allegation of sexual harassment involving Gaunder appears to be one of the allegations of sexual harassment that Siconolfi admitted receiving and appropriately acted upon.  As was discussed in this Court's June 29, 2005 Memorandum and Order, those claims have been dismissed.  (Memorandum and Order, at pp. 17-19 (June 29, 2005)).  However, as was discussed *supra*, Plaintiff will be permitted to establish a causal connection between the other alleged sexual harassment claims and her

---

[11]Defendant notes that, since Plaintiff's termination, Jamie Bihl was married and is now Jamie Masters.  Additionally, Defendant indicates that it is unaware of an employee by the name of "Lisa Loerner" and assumes that Plaintiff is referring to "Lisa Lerdon."

termination.

Plaintiff indicates that the testimony of these witnesses will touch on issues that do in fact remain pending. For instance, Plaintiff indicates that Forquer has knowledge of the sexual harassment investigation, the allegations that made up the sexual harassment investigation and the ensuing sexual harassment training. Plaintiff also indicates that Bihl and Cotter have knowledge of the sexual harassment investigation. Finally, Plaintiff indicates that she discussed the alleged harassment with Loerner during a job interview.

With respect to the witnesses identified by Defendant, this Court agrees that certain testimony of those witnesses may be relevant to the issues that remain pending in this action. For instance, Plaintiff indicates that Loerner's testimony will support Plaintiff's efforts to mitigate damages by seeking re-employment and Defendant's efforts to "road-block" those efforts. Additionally, testimony regarding Defendant's investigation of Plaintiff's complaints is relevant.

As was noted *supra*, unless the evidence is clearly inadmissible, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in the proper context. Indiana Ins. Co., 326 F. Supp.2d at 846. Therefore, Defendant's second motion *in limine* is without merit in this respect.


**WHEREUPON**, Plaintiff's first motion *in limine* (Doc. # 42) is **GRANTED**. The Hanna letter will be excluded from the trial in this action. Plaintiff's second motion *in limine* (Doc. # 45) is also **GRANTED**. The Court will exclude the October 10, 2002 OCRC letter and the December 9, 2002 EEOC letter from the trial in this action.

Defendant's first motion *in limine* (Doc. # 43) is **DENIED**.  Plaintiff will be permitted to introduce evidence regarding back pay, lost benefits and front pay.  Finally, Defendant's second motion *in limine* (Doc. # 44) is **DENIED**.  Admissibility of the testimony of Lisa Loerner, Joe Forquer, Jamie Bihl and Ed Cotter is deferred until offered at trial and will be considered in the context of the record at that time.

**IT IS SO ORDERED.**

November 29, 2005                                    /s/ John D. Holschuh
                                                     John D. Holschuh, Judge
                                                     United States District Court